UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


AILEEN HEDDEN,

               Plaintiff,                                   Hon. Janet T. Neff

v.                                               Case No. 1:10-CV-534

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.
_____/


## REPORT AND RECOMMENDATION

       This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. §

636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and

recommendations for disposition of social security appeals, the undersigned recommends that the

Commissioner's decision be **reversed and this matter remanded for further factual findings**

**pursuant to sentence four of 42 U.S.C. § 405(g)**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 47 years of age on the date of the ALJ's decision. (Tr. 23, 87). Plaintiff successfully completed high school, as well as three years of college, and worked previously as a bus driver. (Tr. 29, 109).

Plaintiff applied for benefits on March 15, 2007, alleging that she had been disabled since October 4, 2005, due to lumbar disc syndrome, depression, and diabetes. (Tr. 87-89, 108). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 60-84). On June 18, 2009, Plaintiff appeared before ALJ Earl Witten, with testimony being offered by Plaintiff and vocational expert, Heather Benton. (Tr. 24-57). In a written decision dated September 28, 2009, ALJ Thomas English determined that Plaintiff was not disabled. (Tr. 13-23). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-5). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

On September 19, 2005, Plaintiff was examined by Dr. John Flood. (Tr. 165-66). Plaintiff reported experiencing "back pain in January of 2005, after a slip and fall." (Tr. 165). Plaintiff reported that her back pain continued "off and on" until August 2005 when "she began

3

having pain radiating into the lateral aspect of the left leg down to but not past the knee." (Tr. 165). Plaintiff reported that her back pain "is aggravated by bending, twisting, or sitting." (Tr. 165). An examination of Plaintiff's lumbosacral spine revealed "tenderness with mild spasm." (Tr. 166). An examination of Plaintiff's lower extremities revealed no motor or sensory deficit, but Plaintiff exhibited "tenderness over the IT band." (Tr. 166). Waddell's test[1] was "negative" and Ober test was "positive for IT band pain and tightness." (Tr. 166). Plaintiff was diagnosed with "lumbar herniated nucleus pulposus with probable inflammatory radiculopathy" and "IT band syndrome."[2] (Tr. 166). Plaintiff was prescribed Celebrex and physical therapy. (Tr. 166).

Treatment notes dated October 17, 2005, indicate that Plaintiff returned to work after one week of physical therapy, but subsequently injured her back while "lifting a wheelchair." (Tr. 164). Plaintiff was instructed to discontinue working and continue participating in physical therapy. (Tr. 164). Treatment notes dated November 14, 2005, indicate that Plaintiff "has been attending physical therapy," but that her condition has "not improved." (Tr. 163).

On March 6, 2006, Dr. Flood reported that Plaintiff was experiencing "an inflammatory radiculopathy" and was not a candidate for surgery. (Tr. 160).

On March 30, 2006, Plaintiff was examined by Dr. Scott Kuhnert with the Ingham Regional Medical Center Pain Management Center. (Tr. 204-05). Plaintiff's ability to forward flex her spine was "limited somewhat secondary to pain" and straight leg raising was positive. (Tr. 205).

---

[1]  A discussion of Waddell's test and the significance thereof is contained in the analysis section below.

[2]  The iliotibial band (IT band) is a thick band of fibers that begins at the iliac crest and continues down the outside part of the thigh where it attaches to the tibia.  *See Iliotibial Band Syndrome (IT Band Syndrome)*, available at http://www.emedicinehealth.com/iliotibial_band_syndrome/article_em.htm (last visited on August 31, 2011).  The IT band, to which the gluteal and hip muscles attach, acts to coordinate muscle function and stabilize the knee.  When the IT band becomes irritated, friction between the IT band and a portion of the thigh bone, may occur with walking or running, causing knee pain due to inflammation on the lateral part of the knee joint.  *Id.*

Lumbar facet "loading maneuvers" reproduced Plaintiff's lower back and hip pain symptoms.  (Tr. 205).  A sensorimotor examination of Plaintiff's lower extremities "was without detectible deficits." (Tr. 205).  Dr. Kuhnert concluded that Plaintiff's lower back pain "is likely a combination of lumbar disc and degenerative changes."  (Tr. 205).  The doctor recommended, and Plaintiff agreed to, a series of lumbar epidural steroid injections.  (Tr. 205).  Treatment notes dated May 17, 2006, however, indicate that Plaintiff had not received much relief from injection therapy.  (Tr. 198).

On May 24, 2006, Plaintiff was examined by Dr. Michael Andary.  (Tr. 195-96). Plaintiff exhibited 5/5 strength and "was able to go up and down on her toes on both sides."  (Tr. 196).  An examination of Plaintiff's back revealed she was experiencing pain.  (Tr. 196).  Waddell's test was "positive for sit straight leg raising and possible for superficial tenderness," but the doctor also noted that Plaintiff's "pain behaviors were normal."  (Tr. 196).  The doctor diagnosed Plaintiff with "low back pain and left leg pain - etiology does not appear compressive."  (Tr. 196).  The doctor recommended that Plaintiff participate in physical therapy and obtain an "overall increase in activity."  (Tr. 196).

On May 25, 2006, Plaintiff participated in an electrodiagnostic evaluation the results of which revealed "abnormalities most consistent with" (1) distal primarily axonal sensorimotor polyneuropathy and (2) superimposed left S1 radiculopathy with a small amount of axon loss.  (Tr. 169).  The examination revealed "no electrodiagnostic evidence for right lumbosacral radiculopathy."  (Tr. 169).  The doctors conducting this examination concluded that the "findings correlate to [Plaintiff's] symptoms."  (Tr. 169).

On June 15, 2006, Plaintiff reported that "she is continuing with the physical therapy and generally finding that to be helpful."  (Tr. 189).

5

On July 13, 2006, Plaintiff reported that her pain "is about 75% better" following two SI joint injections. (Tr. 187). Plaintiff reported that her "pain level vacillates between a 4 and a 5 and she feels like she is continuing to improve." (Tr. 187). Plaintiff reported that "her most significant complaint at this time is the fact that she is still having radicular symptoms down into the buttock and leg." (Tr. 187). Treatment notes dated August 10, 2006, indicate that Plaintiff "continues to have pain down her legs and across her back." (Tr. 185).

On September 13, 2006, Plaintiff was examined by Dr. Andary. (Tr. 180-81). The doctor reported that Plaintiff "continues to have significant low back pain" which "radiates down her left leg." (Tr. 180). Plaintiff reported that she can sit "for about 30 to 60 minutes in a car but starts to hurt quite a bit after only 35 minutes." (Tr. 180). Plaintiff reported that "she is not lasting very long with her standing and that it gets bad after about probably 10 to 20 minutes of straight standing." (Tr. 180). Plaintiff reported that "she does better when she is moving around." (Tr. 180). The doctor reported that Plaintiff was "making progress in much of her areas of therapy" and he encouraged Plaintiff "to increase her exercise at home." (Tr. 180). The doctor concluded that "it seems very unlikely that [Plaintiff] will ever be able to return to work as a bus driver because of the prolonged sitting and pain." (Tr. 180). The doctor also recommended, however, that Plaintiff participate in vocational rehabilitation. (Tr. 180). Plaintiff agreed to this recommendation, indicating that she "would like to do some kind of work." (Tr. 180).

On November 22, 2006, Plaintiff participated in an independent medical evaluation conducted by Dr. Randolph Russo. (Tr. 209-13). The doctor reported that following "a comprehensive history and physical examination on [Plaintiff] her clinical symptoms are consistent with a left S1 radiculopathy." (Tr. 212). The doctor noted that "electrodiagnostic testing supports

6

left S1 radiculopathy" and further noted that Plaintiff "does experience some symptoms radiating to the lateral calf, which may be indicative of some irritation of the L5 nerve root." (Tr. 212).

On February 13, 2007, Plaintiff was examined by Dr. Ryan O'Connor. (Tr. 214-16). The doctor concluded that "[Plaintiff's] physical exam, objective clinical findings, and symptoms are consistent with...chronic left L5-S1 HNP with left S1 radiculopathy." (Tr. 215-16). The doctor recommended "permanent light-to-moderate duty type of restrictions, with no pushing, pulling, or lifting greater than 25 pounds, no frequent bending and twisting at the waist, and sit/stand to tolerance." (Tr. 216).

On March 28, 2007, Plaintiff was examined by Dr. Andary. (Tr. 342-43). Plaintiff reported that she "is continuing to have pain in her back and left leg, posterior buttock, and down the leg into the calf." (Tr. 342). Plaintiff reported that her pain "gets worse with some of her activities," but that she was continuing to complete her physical therapy exercises. (Tr. 342). The doctor concluded that:

> I am not convinced that a work hardening or further investment in physical therapy will significantly alter her medical condition. She has nerve injury and symptoms consistent with this and I highly doubt we will be able to get her back to a job where she is driving and sitting. On the other hand, working towards some kind of job where she has interaction and psychosocial reinforcers, she has the potential to return to some kind of part-time or full-time gainful employment in another situation.

(Tr. 343).

On April 3, 2007, Plaintiff reported that she was experiencing back pain which she rated as "8 out of 10." (Tr. 340). On June 4, 2007, Dr. Kuhnert reported that Plaintiff's "pain level has been fairly stable" and "she is tolerating her medications well from a side effect standpoint." (Tr.

7

338).  On July 19, 2007, Plaintiff participated in an MRI examination of her brain the results of which were "unremarkable."  (Tr. 351).  On August 29, 2007, Plaintiff reported that she "has been doing fairly well."  (Tr. 334).  On September 13, 2007, Plaintiff reported that "her pain is intermittent" and "she is doing fairly well with her medications."  (Tr. 332).

On September 19, 2007, Plaintiff's husband reported to Plaintiff's psychologist that "he believes that [Plaintiff] does not report the extent of her pain to her doctors or anyone because she has a tendency to want others [to] believe that she is doing better than she really is."  (Tr. 330).

On October 8, 2007, Plaintiff was examined by Dr. Kuhnert.  (Tr. 327).  Plaintiff reported that she was experiencing worsening neck pain and headaches.  (Tr. 327).  As part of his examination, the doctor performed Spurling's maneuver[3] which was "positive."  (Tr. 327).

On October 14, 2007, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "mild multilevel degenerative change of the cervical spine with no significant central canal or neural foraminal stenosis at any levels."  (Tr. 509-10).

On October 22, 2007, Plaintiff was examined by Dr. David Kaufman.  (Tr. 312-16). Plaintiff reported that she began experiencing headaches in May 2007.  (Tr. 312).  Plaintiff reported that in the morning her headaches are 7/10 in severity and increase to 10/10 by "later in the day." (Tr. 312).  Plaintiff reported that she has tried medication, "but nothing helps."  (Tr. 312).

On October 29, 2007, Plaintiff participated in an electrodiagnostic evaluation the results of which revealed "electrodiagnostic abnormalities most consistent with a distal, symmetric sensorimotor, primarily axonal polyneuropathy."  (Tr. 290).  This examination revealed "no

---

[3]  A positive Spurling's test suggests the presence of a cervical nerve root disorder.  Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited August 29, 2011).

electrodiagnostic evidence" for cervical radiculopathy, carpal tunnel syndrome, or ulnar neuropathy. (Tr. 290).

On November 5, 2007, Plaintiff participated in a cerebral angiogram examination the results of which were "negative" with "no evidence of aneurism or stenosis." (Tr. 302). Plaintiff also participated in an angiography examination of her neck the results of which were "negative." (Tr. 302). On November 12, 2007, Plaintiff reported that her headache symptoms were "resolving." (Tr. 299). The doctor reported that "the most logical diagnosis is a complicated basilar migraine with component of headache due to chronic analgesic use and possibly sleep apnea." (Tr. 299).

Treatment notes dated January 9, 2008, indicate that Plaintiff "is having some problems with regards to her headaches," but "is a little better" with her current medication. (Tr. 365). Dr. Andary recommended that Plaintiff be treated with Botox, but did not believe that Plaintiff's insurance would pay for such treatment. (Tr. 365).

On February 11, 2008, Plaintiff reported that "her headaches remain constant" and "her pain is a 10/10 by the end of the day." (Tr. 384). On March 26, 2008, Plaintiff reported that her headaches "have improved some, but her back pain has begun to be more noticeable." (Tr. 362). On April 16, 2008, Plaintiff reported that her headaches "have continued to improve, but her back pain has changed and worsened." (Tr. 360). Treatment notes dated April 18, 2008, indicate that the results of EMG testing are "consistent with [Plaintiff's] current symptoms." (Tr. 359). On May 21, 2008, Plaintiff reported that "her back pain is a 6 or 7 and increasing." (Tr. 357). On July 15, 2008, Plaintiff reported that "she did not get any lasting pain relief" from a recent nerve root injection. (Tr. 353).

9

On September 2, 2008, Plaintiff reported that "she continues to have daily headaches" and that "her headache is a constant 4/10 that increases to a 8/10 with triggers of light and smells." (Tr. 417). The doctor noted that Plaintiff was likely suffering from "transformed migraine." (Tr. 420). Plaintiff's medication was increased and she was also scheduled to participate in a sleep study "to assess for sleep apnea which might be contributing to the daily headaches." (Tr. 420). On October 7, 2008, Plaintiff participated in a sleep study the results of which revealed "no evidence of significant apneas, hypopneas or upper airway resistance episodes." (Tr. 414-15).

On December 19, 2008, Plaintiff was examined by Dr. John Flood. (Tr. 449-50). Plaintiff reported that she was experiencing "constant pain in the low back which radiates down the left leg into the calf." (Tr. 449). Plaintiff rated her pain as " 9 out of 10." (Tr. 449). Plaintiff reported that her symptoms are "aggravated by any activity and relieved by nothing." (Tr. 449). Plaintiff exhibited "tenderness to even light palpation of the paraspinal muscles," but the results of a physical examination were otherwise unremarkable. (Tr. 449). Waddell's sign was negative. (Tr. 449). The doctor concluded that Plaintiff was suffering from lumbar degenerative disc disease with chronic low back pain, but that she was not a candidate for surgery. (Tr. 449).

On December 21, 2008, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed the following: (1) multilevel degenerative change of the lumbar spine with "mild" central canal stenosis at L2-3; (2) "mild to moderate" left neural foraminal stenosis at L5-S1; and (3) multilevel facet hypertrophy, most significant at L4-5. (Tr. 451-52).

On March 1, 2009, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "disc bulges at multiple levels producing no significant central canal stenosis or neural foraminal narrowing." (Tr. 512-13).

On March 6, 2009, Dr. John Karakitsos completed a report regarding Plaintiff's ability to perform physical activity.  (Tr. 453-57).  The doctor reported that during an 8-hour workday, Plaintiff is incapable of sitting, standing, or walking due to "chronic daily headaches that have not responded to" treatment.  (Tr. 453).  The doctor reported that Plaintiff was unable to lift any amount due to her  headaches and neck pain.  (Tr. 454).

On March 12, 2009, Dr. Joel Bez completed a report regarding Plaintiff's ability to perform physical activity.  (Tr. 460-63).  The doctor reported that during an 8-hour workday, Plaintiff is unable to sit, stand, or walk.  (Tr. 460).  The doctor further reported that Plaintiff was unable to lift any amount.  (Tr. 461).  The doctor concluded that Plaintiff "cannot work."  (Tr. 462).

On March 23, 2009, Plaintiff was examined by Dr. Kuhnert.  (Tr. 483).  Plaintiff reported that she was experiencing neck pain which radiated down her right arm.  (Tr. 483).  A physical examination revealed "a positive Spurling on the right with radiation of symptoms into the hand."  (Tr. 483).  Plaintiff also exhibited "13 of 18 positive tender points for the ACR guidelines of fibromyalgia."  (Tr. 483).  Plaintiff was administered an epidural pain injection.  (Tr. 483).  On April 2, 2009, Plaintiff reported that this treatment provided her relief for only one week after which her pain began to recur.  (Tr. 481).  Plaintiff was given a second cervical epidural steroid injection. (Tr. 481).  On April 14, 2009, Plaintiff reported that "overall, she is doing pretty well" and that "her two cervical epidurals have helped her."  (Tr. 479).  On May 5, 2009, Plaintiff reported that her "headaches are improved," but that her low back pain has increased.  (Tr. 477).

At the administrative hearing, Plaintiff testified that she experiences "constant" back pain which "stays about an 8" out of 10.  (Tr. 31).  Plaintiff further testified that "3 to 4 times" each week her back pain increases to 10/10.  (Tr. 31).  Plaintiff reported that when her pain becomes that

severe she is unable to concentrate, read, or even watch television.  (Tr. 32).  Plaintiff reported that she can sit "about 20 minutes" without having to move.  (Tr. 33).  Plaintiff also reported that she "can't stand" because she "ha[s] to move" and "can't be in one position."  (Tr. 34).  Plaintiff reported that she experiences "constant" headaches which rate "about a 4" out of 10.  (Tr. 35).  Plaintiff reported that lights, sound, and smells make her headaches worse.  (Tr. 36).  Plaintiff reported that she could lift "maybe 10 pounds."  (Tr. 38).  Plaintiff also reported that she is unable to perform household chores.  (Tr. 39-40).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from: (1) degenerative disc disease; (2) diabetes with mild peripheral polyneuropathy; (3) migraine headaches; and (4) obesity, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 15-19).  The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations.  (Tr. 19-23).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4]  If the Commissioner can make a

---

[4] 1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following limitations: (1) she can lift and carry 10 pounds occasionally and five pounds on a routine basis; (2) she can stand and/or

---

which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

walk for two hours during an 8-hour workday, but not continuously; (3) she can sit for six hours during an 8-hour workday, but not continuously; (4) she cannot squat, kneel, twist, or turn; (5) she cannot work around unprotected heights or dangerous moving machinery; (6) she can only occasionally bend, twist, or turn; (7) she is unable to carry out complex or detailed instructions; and (8) she can perform only unskilled work. (Tr. 19).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Heather Benton.

The vocational expert testified that there existed at least 6,700 jobs in the lower peninsula of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 55-56). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar.

14

1, 2006).  The vocational expert further testified, however, that if Plaintiff's testimony was credible, there did not exist any work which she could perform.  (Tr. 56).

        a.      The ALJ Properly Evaluated the Medical Evidence[5]

As previously noted, on March 6, 2009, Dr. Karakitsos reported that during an 8-hour workday, Plaintiff is incapable of sitting, standing, or walking due to "chronic daily headaches that have not responded to" treatment.  The doctor also reported that Plaintiff was unable to lift any amount due to her headaches and neck pain.  Three days later, Dr. Bez reported that during an 8-hour workday, Plaintiff is unable to sit, stand, walk, or lift any amount.  The doctor concluded that Plaintiff "cannot work."  Plaintiff asserts that because Dr. Karakitsos and Dr. Bez were her treating physicians, the ALJ was obligated to afford controlling weight to their opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

---

[5]  Defendant asserts that the only claim Plaintiff has presented in this appeal is that the ALJ improperly failed to afford controlling weight to the opinions expressed by Dr. Karakitsos and Dr. Bez.  (Dkt. #7 at 12).  Defendant asserts that Plaintiff has waived any other argument.  The Court disagrees.  While not artfully stated, the Court finds that Plaintiff has also raised the following claims (each of which is addressed below): (1) ALJ English improperly failed to conduct a second administrative hearing, (2) the ALJ improperly discounted Plaintiff's subjective allegations, and (3) the ALJ's RFC determination is not supported by substantial evidence.

15

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ afforded the opinions in question "minimal" weight on the ground that "they are not well supported objectively and are inconsistent with other substantial evidence in the case record." (Tr. 21). The ALJ further concluded that "[s]uch incredible level of dysfunction" is not

supported by the doctors' "progress reports or any other available evidence." (Tr. 21). The ALJ also noted that another of Plaintiff's treating physicians, Dr. Andary, concluded that while Plaintiff was unable to return to her job as a bus driver she could nonetheless participate in vocational rehabilitation in hopes of obtaining some other type of work. The ALJ's rationale for affording less than controlling weight to the opinions expressed by Dr. Karakitsos and Dr. Bez is supported by substantial evidence. Accordingly, this argument is rejected.

b.      A Second Administrative Hearing was not Required

As previously noted, Plaintiff's administrative hearing was conducted by ALJ Earl Witten. The determination to deny Plaintiff's claim for benefits, however, was made by ALJ Thomas English. ALJ English noted that ALJ Witten was "unavailable to issue the decision due to prolonged leave." (Tr. 13). The matter was reassigned to ALJ English "who reviewed the record and determined that a new hearing was not required." (Tr. 13). Plaintiff asserts that ALJ English committed legal error by failing to conduct a second administrative hearing.

In support of her argument, Plaintiff relies on § I-2-8-40 of the Social Security Administration Hearings, Appeals and Litigation Law Manual ("HALLEX"). This section provides in relevant part as follows:

> When an Administrative Law Judge (ALJ) who conducted a hearing in a case is not available to issue the decision because of death, retirement, resignation, illness which has caused the ALJ to be on leave for such illness for at least twenty days and which illness would keep the ALJ from fulfilling necessary duties, or other cause resulting in prolonged leave of twenty or more days, the Hearing Office Chief ALJ (HOCALJ) will reassign the case to another ALJ. The ALJ to whom the case is reassigned will review the record and determine whether or not another hearing is required to issue a decision. The

ALJ's review will include all of the evidence of record, including the audio recording of the hearing.

- If the ALJ is prepared to issue a fully favorable decision, another hearing would not be necessary.

- If the ALJ is prepared to issue a less than fully favorable decision, another hearing may be necessary. For example, another hearing would be necessary if relevant vocational expert opinion was not obtained at the hearing, or the claimant alleges disabling pain, and the ALJ believes the claimant's credibility and demeanor could be a significant factor in deciding the case.

*Id.*

Plaintiff asserts that because ALJ English discounted her subjective allegations, he was required to first conduct a second administrative hearing. First, the Court is aware of no controlling authority holding that the HALLEX regulations carry the force of law such that failure to act in conformity therewith is a sufficient basis for relief. *See, e.g., McMurtry v. Astrue*, 749 F.Supp.2d 875, 880-81 (E.D. Wis. 2010) ("HALLEX manual is not binding on the agency and has no legal force"); *Edwards v. Astrue*, 2011 WL 3490024 at *6 (D. Conn., Aug. 10, 2011) ("HALLEX policies are not regulations and therefore not deserving of controlling weight"). However, even if the Court assumes that HALLEX regulations carry the force of law, the Court discerns no violation of the provision in question.

Contrary to Plaintiff's argument, § I-2-8-40 does not require a second hearing where the substitute ALJ finds a claimant less than credible. Instead, this section provides that "another hearing would be necessary if. . .the claimant alleges disabling pain, and the ALJ believes the claimant's credibility *and* demeanor could be a significant factor in deciding the case." In this case,

18

ALJ English found Plaintiff less than credible based on his assessment of the medical record not because of any findings or assessment regarding Plaintiff's demeanor.  In such a circumstance, a second administrative hearing is not mandatory.  *See, e.g., Shave v. Apfel*, 238 F.3d 592, 597 (5th Cir. 2001) (§ I-2-8-40 does not require a second hearing where the claimant's subjective allegations are rejected "not upon [the claimant's] demeanor or any other factor that would be better observed in a live hearing, but upon controverting and overwhelming medical evidence to the contrary"); *George v. Astrue*, 338 Fed. Appx. 803, 805 (11th Cir., July 8, 2009) (same).  The Court, therefore, rejects this argument.

        c.     The ALJ's Decision to Discount Plaintiff's Subjective Allegations is not Supported by Substantial Evidence

As previously noted, Plaintiff testified that she experiences "constant" back pain which "stays about an 8" out of 10 and increases to 10/10 "3 to 4 times" weekly.  Plaintiff testified that she experiences "constant" headaches which are exacerbated by light, sound, and smell. Plaintiff testified that she can sit for only 20 minutes without having to move and "can't stand" because she "ha[s] to move" and "can't be in one position."  Plaintiff reported that as a result of her limitations she is unable to perform even household chores.  As previously noted, the vocational expert concluded that if Plaintiff's testimony was credible, there did not exist any work which she could perform.  The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 20).  Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same).   As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."  20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to

resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

A review of the ALJ's basis for discounting Plaintiff's subjective allegations does not survive scrutiny. The ALJ first relied on his conclusion that "no physician imposed an ongoing work preclusive limitation on [Plaintiff's] functioning." (Tr. 20). As previously noted, however, Dr. Karakitsos and Dr. Bez each concluded that Plaintiff was impaired to an extent that precluded regular work activity. While the ALJ properly afforded these opinions less than controlling weight, the Court fails to discern how such detracts from *Plaintiff's* credibility. If anything, the fact that two of Plaintiff's treating physicians imposed such extreme limitations on Plaintiff would appear to support her subjective allegations.

The ALJ also concluded that "certain clinicians questioned the claimant's presentations and volitionary effort, and in some instances she displayed positive Waddell's signs,

inconsistent symptom reproduction and borderline effort." (Tr. 21). This conclusion is not supported by substantial evidence.

First, the ALJ appears to misinterpret the significance of a positive Waddell's sign. Implicit in the ALJ's decision is that a positive Waddell's sign is a sign of malingering or symptom exaggeration. Waddell's sign, however, does not detect malingering or symptom exaggeration, but is instead utilized to assess whether a patient's pain or symptoms have a non-organic component. *See, e.g.,* Gordon Waddell, M.D., *Waddell's Signs - Do they Mean Malingering?*, Disability Medicine, March-June 2004 at 38-39; Steven Greer, M.D. and Leslie Mackler, *What Physical Exam Techniques are Useful to Detect Malingering*, The Journal of Family Practice, August 2005 at 719-22. Moreover, as Dr. Waddell states:

> Nonorganic signs in low back pain were described a century ago in the context of workers compensation and the modern set of signs was standardized in 1980 (Waddell et al 1980). They have stood the test of time, despite periodic controversy about their clinical use (Main & Waddell 1998, Fishbain et al 2003, Conteno et al 2004, Waddell 2004a & b).

> They are also relevant to disability evaluation, where they are still often misinterpreted. In the context of a claim for compensation, nonorganic signs may (reasonably) raise the question of 'malingering'. However, nonorganic signs are common in chronic pain patients in a clinical setting where there is no compensation. Thus, the presence of nonorganic signs *per se* does not necessarily mean that a patient is lying or attempting to deceive the examiner, and that conclusion cannot be based on this clinical finding alone.

Gordon Waddell, M.D., *Waddell's Signs - Do they Mean Malingering?*, Disability Medicine, March-June 2004 at 38.

The conclusion that a positive Waddell's sign is *not* an indication of malingering or symptom exaggeration is further supported by the record in this case. On May 24, 2006, Plaintiff

22

was examined by Dr. Andary. (Tr. 195-96). While Dr. Andary observed that Waddell's sign was "positive for sit straight leg raising and possible for superficial tenderness," the doctor also specifically observed that Plaintiff's "pain behaviors were normal." If Waddell's sign were intended to measure malingering or symptom exaggeration, it seems unlikely that the doctor would have concluded that Plaintiff's "pain behaviors were normal." The Court also notes that on at least two other occasions, Plaintiff's care providers reported that Waddell's sign was negative. (Tr. 166, 343). Thus, to the extent that the ALJ discredited Plaintiff's subjective allegations because of a positive Waddell's sign, the Court finds such unpersuasive.

The Court notes that the ALJ also failed to identify any portion of the record in support of his conclusion that "certain clinicians questioned the claimant's presentations and volitionary effort, and in some instances she displayed positive Waddell's signs, inconsistent symptom reproduction and borderline effort." In support of the ALJ's position, Defendant has identified only two pages in the administrative record neither of which support the ALJ's conclusion.

Defendant cites to the notes of a March 30, 2006 examination conducted by Dr. Kuhnert. (Tr. 205). The doctor did not report that Plaintiff exhibited a positive Waddell's sign and the Court discerns nothing in this report to support the ALJ's conclusion that Plaintiff exhibited "inconsistent symptom reproduction and borderline effort." Defendant also cites the results of Dr. Andary's May 24, 2006 examination of Plaintiff, which as discussed immediately above directly contradicts the ALJ's conclusion. The Court further notes that the results of numerous physical examinations and objective testing revealed findings that Plaintiff's care providers indicated were *consistent with* her symptoms and allegations. (Tr. 169, 205, 212, 215-16, 290, 359).

23

The ALJ also discredited Plaintiff's testimony because she "applied for jobs with prospective employers." (Tr. 21). However, the portions of the record cited by the ALJ in support of this conclusion simply do not support his conclusion. For example, the ALJ cites to Exhibit 4E, 24F, and Plaintiff's administrative hearing testimony, but the Court discerns nothing in these portions of the administrative record that detracts from Plaintiff's credibility (or supports the ALJ's observation that Plaintiff was seeking employment). Based on a review of the other two exhibits cited by the ALJ, Exhibits 17F and 25F, it appears that the ALJ discounted Plaintiff's credibility because she participated in vocational rehabilitation. The Court fails to discern how Plaintiff's participation in vocational rehabilitation, at the suggestion of her care providers, detracts from her credibility. If anything, Plaintiff's participation in vocational rehabilitation and attempts to return to gainful employment, like her positive work history, bolster her credibility. *See, e.g., White v. Commissioner of Social Security*, 312 Fed. Appx. 779, 798 (6th Cir., Feb. 24, 2009) (claimant's "extensive work history and attempts to continue working despite his disability support his credibility"); *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) (the ALJ must consider a claimant's work history when assessing her credibility and a good work history strengthens the claimant's credibility); *Miller v. Barnhart*, 2002 WL 31243422 at *5 (D. Kansas, Sept. 17, 2002) (claimant's work history is relevant in assessing her credibility); *Warren v. Barnhart*, 190 F.Supp.2d 1173, 1178 (E.D. Ark. 2002) (*citing Nunn v. Heckler*, 732 F.2d 645 (8th Cir. 1984)) ("a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability"); *Tyson v. Apfel*, 107 F.Supp.2d 1267, 1270-71 (D. Colo. 2000) ("[w]here a claimant has a good work history, she is entitled to substantial credibility when she then asserts that she is unable to work").

The Court further notes that Plaintiff's reported activities are completely consistent with her testimony and subjective allegations. *See Leos v. Comm'r of Soc. Sec.*, 1996 WL 659463 at *2 (6th Cir. 1996) (the fact that a claimant performed limited nonstrenuous activities does not preclude a finding that she experiences pain to a disabling degree); *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir. 1990) ("sporadic or transitory activity does not disprove disability"); *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (to be found unable to engage in substantial gainful activity the claimant need not "vegetate in a dark room" or be a "total basket case").

In sum, the ALJ's decision to discount Plaintiff's credibility and discredit her testimony and subjective allegations is not supported by substantial evidence.


d.      The ALJ's RFC Determination is not Supported by Substantial Evidence

As detailed above, the ALJ assessed Plaintiff's residual functional capacity and concluded that Plaintiff retains the ability to perform a limited range of sedentary work.  The ALJ's RFC determination, however, is premised on his unsupported evaluation of Plaintiff's credibility. Moreover, the medical evidence fails to support the ALJ's RFC determination.  The Court offers no opinion as to Plaintiff's residual functional capacity, as determination of such is beyond the authority and skill of this Court, but instead simply concludes that the ALJ's RFC determination is not supported by substantial evidence.

The vocational expert testified that given Plaintiff's RFC, there existed a significant number of jobs which Plaintiff could perform despite such limitations.  However, the ALJ's RFC determination is not supported by substantial evidence.  Because the vocational expert's testimony was premised upon a faulty RFC determination, the ALJ's reliance thereon does not constitute

substantial evidence.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996) (while the ALJ may rely upon responses to hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments).

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling." *Faucher v. Secretary of Health and Human Serv's*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling).  While the ALJ's decision fails to comply with the relevant legal standard, there does not exist *compelling* evidence that Plaintiff is disabled.  As discussed herein, resolution of Plaintiff's claim requires the resolution of factual disputes which this Court is neither authorized nor competent to undertake in the first instance.  The undersigned recommends, therefore, that the Commissioner's decision be reversed and this matter remanded for further factual findings.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g)**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order.  *See*

*Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  September 6, 2011                    /s/ Ellen S. Carmody
                                           ELLEN S. CARMODY
                                           United States Magistrate Judge

27